IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CRYSTAL HEAD, | ) | CASE NO. 1:25-cv-01997-DCN |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| FRANK BISIGNANO, | ) | |
| Commissioner of Social Security | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

## I.      Introduction

Plaintiff Crystal Head ("Head") seeks judicial review of the final decision of the

Commissioner of Social Security, denying her application for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act and for Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C.

§§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ")

applied proper legal standards, I recommend that the Commissioner's final decision denying

Head's DIB and SSI applications be affirmed.

## II.      Procedural History

On November 2, 2020, an ALJ entered a Notice of Decision finding Head not disabled.

(Tr. 74-89). Head subsequently protectively filed for DIB and SSI on April 11, 2023, alleging a

disability onset date of November 3, 2020. (Tr. 234). The claims were denied initially and on

reconsideration. (Tr. 94-95, 108-09). Head then requested a hearing before an ALJ. (Tr. 152-53).

Head, represented by counsel, and a Vocational Expert ("VE") testified before an ALJ on July 1,

1

2024. (Tr. 37-69). On October 25, 2024, the ALJ issued a written decision finding Head not disabled. (Tr. 10-25). The Appeals Council denied her request for review on July 23, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; see 20 C.F.R. §§ 404.955, 404.981). Head timely filed this action on September 19, 2025. (ECF Doc. 1). She asserts a single assignment of error:

1. The ALJ failed to tether the RFC to substantial evidence after failing to admit the prior determination's evidence.

(ECF Doc. 10, p. 1).

### III.    Evidence

#### A.    Personal, Educational, and Vocational Evidence

Head was born March 3, 1982. (Tr. 234). She was 37 years old on her alleged onset date, making her a younger individual acccording to agency regulations. (Tr. 96). She has at least a high school education. (Tr. 24). She has past relevant work in a composite job consisting of supervisor, general retailer, DOT 185.117-014 and salesclerk, DOT 279.357-054, which is medium with an SVP of 6; and a composite job comprised of tire changer, DOT 915.684-010, and assistant manager, DOT 189.167-018, described as medium with an SVP of 6. (Tr. 23).

#### B.    Relevant Medical Evidence

On February 12, 2019, an MRI of Head's right knee showed diffuse mucinous degeneration of the ACL; mild generalized edema within the fat of the posterior knee joint recess nonspecific which may reflect component of capsular sprain with mild pericapsular edema about the posterior knee joint capsule; and semimembranosus bursitis with fluid collection about the semimembranosus tendon complex. (Tr. 508).

Head had a behavioral health telephone consultation with Craig Djukic, BHSW, on December 10, 2020. (Tr. 397). She reported that she was experiencing anxiety and stress, and

was seeking medication management and coping skills to help with her symptoms. (*Id.*). She was referred to psychology for therapy and to psychiatry for medication management. (Tr. 398). Head met with Kelly Christy, LPCC, of Signature Health for an initial meeting on February 6, 2021. (Tr. 631). Head reported symptoms of depression, anxiety, and grief, noting that she had been having dreams about her mother who died in 2016. (*Id.*). At an April 26, 2021 counseling session, Head described herself as "suicidal" after having a physical altercation with her significant other that led to the police being called. (Tr. 685). She threatened to shoot her significant other if he hurt her again physically. (*Id.*).

On April 29, 2021, Head presented to Chistine Miskinis, PA, for an evaluation of right hand pain and swelling that began the night before when she punched a car out of anger. (Tr. 384). Examination notes indicate that her right hand was swollen and tender, with bony tenderness, but had normal strength, sensation, and capillary refill. (Tr. 386). There was tenderness to palpation to the right fourth and fifth metacarpals ("MCP") with swelling, slightly decreased range of motion in the fifth MCP joint, and slightly decreased grip strength. (*Id.*). An x-ray revealed a Boxer's fracture and osteoarthritis of the wrist, and she was assessed with a closed, displaced fracture of the fifth MCP bone of the right hand. (Tr. 387). Head met with Orthopaedic Surgeon Yuji Umeda, M.D., Ph.D., on May 4, 2021, who indicated that the injury was non-operative and recommended an ulnar gutter cast including the small and ring fingers. (Tr. 379-80).

On August 10, 2021, Head had a psychiatric telephonic follow-up meeting with Danielle Mutter, APN, of Signature Health. (Tr. 588). Head reported symptoms including panic, irritability, appetite change, and sleep disturbance. (*Id.*). She denied sadness, nervousness/anxiousness, hallucinations, delusions, weight change, suicidal ideas, or homicidal

ideas. (*Id.*). She has historically found medications, self-help treatments, and psychotherapy to be useful, but has recently been yelling, snapping, and lashing out. (*Id.*). She has tried trazadone to help her sleep, but worries she will not wake up if her son needs her, and she takes Vistaril about three times weekly when she feels an anxiety attack coming on. (*Id.*).

At a March 23, 2022 telephone counseling visit with LPCC Christy, Head indicated that she was involved in an abusive relationship. (Tr. 572). She again acknowledged that her relationship was abusive on March 30, 2022, and was assessed with generalized anxiety disorder ("GAD") and persistent depressive disorder. (Tr. 571). On May 19, 2022, Head was assessed with major depressive disorder, recurrent, moderate. (Tr. 566).

Head participated in a video medication management and psychiatric evaluation for mood swings with APN Mutter on September 13, 2022. (Tr. 547). She reported that she has been unable to control her mood swings for ten years, and added that she felt sad, down, and depressed, and that those symptoms could last for two weeks at a time. (*Id.*). Head stated that she had been having intrusive thoughts of her mother, crying bouts, low energy and motivation, loss of interest, and fatigue. (*Id.*). She further reported being overly emotional, and that she had been sleeping excessively. (*Id.*). She had feelings of hopelessness and helplessness, was socially withdrawn, and had some suicidal ideations though without a plan. (*Id.*). She was worrying excessively, edgy, irritable, and short-tempered, and had experienced panic attacks in social situations. (*Id.*). She was assessed with obstructive sleep apnea, persistent depressive disorder, and panic attacks. (Tr. 549).

At a February 9, 2023 counseling visit with LPCC Christy, Head indicated that she had found a job at Wal-Mart. (Tr. 527). She was feeling anxious because her fiancée had been calling her daily from jail. (*Id.*). Head presented for her February 16, 2023 counseling session with mild

4

anxiety, and expressed that she coping with her depression better and felt she needed to focus on her anger. (Tr. 525). She continued to present with anxiety on March 2, 2023, and reported she was struggling with irritability. (Tr. 523). She had been irritable and aggravated when her son's school had called to ask about his absences, and she was looking for a different job because she had only been given one shift at Wal-Mart. (*Id.*).

Head presented to her counseling visit on April 27, 2023 with anger and agitation, reporting that her son's father had died. (Tr. 515). Head further expressed concern about her financial situation and was upset because her daughter had told her she would not help care for Head's son. (*Id.*).

At a medication management appointment on June 5, 2023, Head reported symptoms including sadness, decreased interest, hopelessness, lack of motivation, nervousness/anxiousness, panic, erratic or racing thoughts, difficulty concentrating, and sleep disturbance. (Tr. 715). Her symptoms would wax and wane, but occurred most days. (*Id.*). She reported that self-help and psychotherapy had been beneficial, and she had been taking higher doses of Cymbalta and Abilify that had improved her mood and decreased her panic. (*Id.*). Still, she reported loss of interest, excessive worry, feeling overwhelmed and distracted, poor memory, and inattentiveness. (*Id.*). She was assessed with persistent depressive disorder and panic attacks. (Tr. 747).

Head had a telehealth visit on September 29, 2023 with Erin Cooper, APRN, CNP. (Tr. 1233). She indicated she had swelling all over her body that had been ongoing for several months and getting worse. (*Id.*). She also stated that her lips were purple, she had brain fog and issues with word recall, tingling in her fingers, and intermittent headaches. (*Id.*). She was

assessed with edema in her bilateral upper and lower extremities, and brain fog, and instructed to go to the emergency department and "strongly advised against delaying care." (Tr. 1236).

Head attended a consultative examination on December 16, 2023 with Madeeha Khan, D.O. (Tr. 926-38). Head listed her chief complaints as rheumatoid arthritis, fibromyalgia, and autoimmune disorder. (Tr. 926). She reported her rheumatoid arthritis was primarily in her hands, feet, ankles, and knees, and, although she had discontinued annual Rituxan infusions, she no longer had flares. (Tr. 927). Rather, she now experienced constant pain that interfered with her ability to play with her son or to perform household chores, and she constantly dropped things. (*Id.*). It was painful for Head to be touched due to her fibromyalgia, and Sjorgen's Syndrome caused mouth dryness. (*Id.*). Her Graves' Disease left her with low energy, she needed B12 shots for her pernicious anemia, and she struggled with anxiety, chronic depression, post-traumatic stress disorder ("PTSD"), and emotional dysregulation. (*Id.*). Head reported that she would avoid her counselor's telehealth calls, and was no longer taking her medications; she stated her depression was making her question if she wanted to keep living. (*Id.*). She stated she was capable of sitting for 20 to 30 minutes, standing for 15 minutes, walking 50 feet and lifting 5 to 10 pounds. (Tr. 928). She reported blurry vision and mucous discharge from her eyes, and Dr. Khan noted that her eyes watered throughout the examination. (Tr. 929). Examination notes showed significant pitting edema in her bilateral lower extremities, dry mouth, good hand-eye coordination and balance, and a normal reciprocal gait pattern. (Tr. 930). She did have numbness in her bilateral fingertips, swelling in both hands, decreased hand grip and dexterity, and tendermess in bilateral trigger points. (*Id.*).

At a February 22, 2024 office visit at the Madison Express Clinic with Meggan Dwyer, APRN, CNP, Head reported that her leg swelling had been present for six months, and that she

6

was experiencing shortness of breath she attributed to smoking. (Tr. 1215). She was very fatigued and her friends told her that she was falling asleep in the middle of conversations. (*Id.*). She told CNP Dwyer she had Graves' Disease, but had discontinued Synthroid, and now had dry skin and cold intolerance. (*Id.*). She had 1+ pitting edema in her bilateral lower extremities. (Tr. 1217). She was assessed with Graves' Disease, hypothyroidism, and leg swelling. (Tr. 1218).

Head was admitted to the University Hospital Medical Center with severe hypothyroidism on February 24, 2024. (Tr. 2342). Her symptoms included whole body swelling worst in her lower extremities, reduced sensation in her fingertips, severe headaches, confusion, slurred/slowed speech, fatigue, worsening hearing loss, falling asleep even when standing, blurry vision, joint pain, myalgias, diffuse weakness, shortness of breath, always cold, dry skin, depression, and incontinence. (*Id.*). Her acute medical conditions included hypothyroidism with medication non-adherence, rhabdomyolysis, urinary tract infection, normocytic anemia, and sensorineural hearing loss. (Tr. 2348). At a March 28, 2024 follow-up visit with Jennifer Stauffer, APRN, CNP, she indicated seeing improvement with her symptoms since starting back on Synthroid. (Tr. 1167). She had suffered renal insufficiency, and her lower extremity edema had spread to her thighs. (*Id.*). She was struggling with compression stockings due to swelling and discomfort. (*Id.*).

With better control of her hypothyroidism, Head reported on Aril 18, 2024 that her vision and hearing were improving, to the point she felt she no longer needed her hearing aid. (Tr. 2233). Her kidney function had returned to normal, but her right hand was swollen and painful because she had again punched a car when she was angry. (*Id.*). She reported that she was capable of sleeping 15 hours per day, but she found her compression stockings were helping her lymphedema. (*Id.*). She was assessed with postablative hypothyroidism, vitamin B12 deficiency,

lymphedema, right hand pain and injury, fatigue of unspecified type, and obstructive sleep apnea. (Tr. 2234-35). Head was assessed for physical therapy to treat lymphedema on May 6, 2024 because it was interfering with standing, walking, stair negotiation, and physical and recreational activities. (Tr. 1007).

Head attended a virtual endocrinology visit on May 9, 2024, and reported some improvement since restarting thyroid hormone replacement. (Tr. 980). She still complained of excessive fatigue. (*Id.*).

### C. Medical Opinion Evidence

#### 1. State Agency Medical Reviewers

On August 10, 2023, state agency reviewing physician Lynne Torello, M.D., determined that there was insufficient evidence in the record for her to formulate a medical opinion. (Tr. 99). Similarly, state agency reviewing psychologist Jennifer Swain, Psy.D., found there was insufficient evidence to form a medical opinion on August 24, 2023. (*Id.*).

On November 10, 2023, state agency reviewing psychologist Deryck Richardson, Ph.D., adopted the findings of a prior ALJ decision issued November 2, 2020, which determined that Head had moderate limitations in the domains of interacting with others; concentration, persistence, and maintaining pace; and adapting and managing oneself. (Tr. 114). On December 25, 2023, state agency reviewing physician Venkatachala Sreenivas, M.D., also adopted the RFC from the prior ALJ decision, finding that Head was capable of performing light work, but could only stand for one hour at a time and would then need to sit for a few minutes; could only occasionally climb ramps or stairs, but never climg ladders, ropes or scaffolds; could occasionally stoop, kneel, crouch or crawl; and could frequently handle and finger bilaterally. (Tr. 115-16).

### 2. Consultative Examiner Opinion

On December 16, 2023, consultative examiner Dr. Khan opined that Head's strength and range of motion were within normal limits bilaterally except in her hands; that she was able to sit, stand, and walk; she was able to rise from the examination table without problems or assistance; that her speech, hearing, vision, sensation, and reflexes were grossly intact; and that her fine motor coordination and handling were not normal. (Tr. 932).

### D. Administrative Hearing Evidence

Head testified before an ALJ on July 1, 2024. (Tr. 45-66). Head stated that she was unable to work due to her pain from arthritis flareups and fibromyalgia. (Tr. 45). She further complained of swelling in all of her joints, most notably in her wrists, hands, fingers, knees, feet, and ankle. (*Id.*). Her flareups typically last for two to four days, but have lasted for as long as a week. (*Id.*). Her flareups occur when she overexerts herself, and she has noticed them occurring as often as twice monthly when she was working full-time. (*Id.*). She will also have flareups if she overexerts herself doing household chores. (Tr. 46). It will typically take her an hour to vacuum a room in her house, including a 15 minute break. (*Id.*).

Head testified that when her hands swell she has difficulty with buttons, and she will have numbness in her hands that leads to her dropping things. (Tr. 47-48). She has dropped pens and pencils, utensils when cooking, and drinking glasses. (Tr. 48). She could not write for more than five minutes at a time without developing trigger finger. (*Id.*). Even after her trigger finger resolves, her hands remain weak and her grip suffers. (Tr. 49).

When her feet and knees swell, she tries to elevate them, and she has worn braces on her wrist and knees to try to address the swelling. (*Id.*). She has both a walker and rollator that she purchased for herself without a prescription. (Tr. 49-50). She will typically use these only during

9

flareups. (Tr. 50). She also has a reaching and grabbing device she uses so that she does not have to bend over. (*Id.*). Head reports stopping to rest at least once an hour for at least 10 to 15 minutes at a time because if she does not, she will become weak throughout her body, and that can lead to a flareup. (Tr. 51). She further testified that she has been unable to lose weight and her BMI of 37 to 37.9 has been a comorbidity for her since she first had arthritis. (Tr. 52).

As a result of her arthritis and fibromyalgia, Head testified that she has been prescribed tramadol which she takes as a last resort, and she will also take acetaminophen and ibuprofen. (Tr. 53). She stated that her fibromylagia causes severe fatigue and difficulty with concentration. (Tr. 54). She continues to have weekly headaches due to her high blood pressure though she used to have three per week before she gained more control over her blood pressure. (*Id.*). The headaches tend to drain her energy, cause fatigue, and sensitivity to light and sound. (Tr. 55). When she gets a headache, she has to go to a dark room and sleep it off. (*Id.*).

Head further testified that her anxiety has grown so severe that she is "kind of like a hermit." (Tr. 56). She rarely leaves home and has no friends, and she puts off grocery shopping until she has no choice but to go. (*Id.*). If she goes somewhere unfamiliar, she will often experience an anxiety attack. (*Id.*). She will typically have at least one anxiety attack per week, but when she tries to leave home more regularly, she will have more attacks. (Tr. 56-57). If she has to interact with her son's teacher she finds that she gets angrier than she should because of her anxiety. (Tr. 57).

Head also testified that she has bouts of depression so severe she is unable to get out of bed. (Tr. 58). She admits that when she is doing better she tends to stop participating in counseling, but then she will become overwhelmed and become depressed again. (*Id.*). Though she states she would not act on it, there are times she begins to feel that the world would be

better off without her. (*Id.*). Head testified to having PTSD, and reported having flashbacks and triggers that cause her to feel scared. (Tr. 59-60). Her triggers include loud yelling, body language, and certain subjects being raised. (Tr. 60). She also reported hearing and vision problems that she attributed to her thyroid levels, and severe swelling in her feet related to vascular issues. (Tr. 61). Head added that she had not been to see doctors for over two years due to a domestic violence situation. (Tr. 63). She is not currently taking her mental health medications. (Tr. 64).

VE Jacqueline Bethell then testified. (Tr. 66-72). With regard to past work, the ALJ adopted the past relevant work found in the previous ALJ decision which included a composite job comprised of tire changer, DOT 915.684-010, and assistant manager, DOT 189.167-018, which had an SVP of 6 and was performed at the medium exertional level; and a second composite job comprised of supervisor, general retail, DOT 185.117-014, and salesclerk, DOT 279.357-054, which had an SVP of 6, and was performed at the medium exertional level. (Tr. 66-67).

For his first hypothetical, the ALJ asked the VE to consider an individual capable of performing work at the light exertional level, with the additional limitations that they could occasionally use ramps and stairs but never use ladders, ropes, or scaffolds; could occasionally stoop, kneel, crouch, or crawl; could stand for one hour at a time and then would need to sit for a few minutes; could perform simple, routine, repetitive tasks; could frequently handle and finger bilaterally; could sustain a simple routine, and a repetitive task over the course of a normal workday and workweek without interference from psychologically based symptoms; could adapt to the customary demands of work in a competitive workplace where work setting or tasks are simple, routine, and repetitive; and would do best with with brief and superficial contact with the

11

public, with superficial defined as being able to provide directions to the nearest restroom, but that would be the extent of the interaction. (Tr. 68-69). The VE opined that such an individual would be incapable of performing Head's past work but could work as a mail clerk, DOT 209.687-026, light exertional level, SVP 2, with approximately 12,700 jobs nationally; as a small parts assembler I, DOT 706.684-022, light exertional level, SVP 2, with approximately 20,300 jobs nationally; and as an office helper, DOT 239.567-010, light exertional level, SVP 2, with approximately 10,400 job nationally. (Tr. 69-70).

For a second hypothetical, the ALJ asked the VE to consider all of the same circumstances of the first hypothetical, except that this individual would be limited to occasional handling and fingering. (Tr. 70). The VE opined there would be no jobs in the national economy that such an individual could perform. (*Id.*).

For his third hypothetical, the ALJ again asked the VE to consider all of the same circumstances of the first hypothetical, except that this hypothetical individual would require frequent breaks throughout the day due to ongoing and unrelenting pain or fear of experiencing said pain or just because of fatigue, and would be off-task 20 percent of any given workday. (Tr. 70-71). The VE opined there would be no work in the national economy that this individual could perform. (Tr. 71).

Under questioning from Head's attorney, the VE opined there would be no jobs available for the individual from the ALJ's first hypothetical if that individual also required the ability to occasionally elevate their legs to waist height or higher. (*Id.*). The individual would also be unable to maintain competitive employment if they were absent two days or more per month. (Tr. 71-72).

IV.     **The ALJ's Decision**

12

In his decision dated October 25, 2024, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2025.

2. The claimant has not engaged in substantial gainful activity since November 3, 2020, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3. The claimant has the following severe impairments: seropositive rheumatoid arthritis, fibromyalgia, obesity, major depressive disorder, panic disorder, and unspecified anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20CFR 404.1567(b) and 416.967(b) except she can occasionally use ramps and stairs, but never ladders, ropes or scaffolds. She can occasionally stoop, kneel, crouch and crawl. She can stand and walk for one hour at a time. She can lift up to 20 pounds. She is capable of performing, simple, routine, repetitive taks. She can frequently perfom handling and fingering bilaterally. She can sustain a simple, routine and/or repetitive tasks over the course of a normal workday and workweek without interference from psychologically based symptoms. The claimant can adapt to the customary demands of work in a competitive work setting where tasks are simple, routine and/or repetitive. She would do best with brief and superficial contact with the public, and by superficial, I mean if a member of the public were to approach and ask directions to the nearest restroom, they would be able to provide such information, but that would be the extent of the interaction. She could have occasional contact with coworkers.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965)

7. The claimant was born on March 3, 1982, and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills    an issue in this case because the claimant's past relevant work is unskilled (See SR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 3, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-29).

## V.     Law and Analysis

### A.     Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits:

1.      whether the claimant is engaged in substantial gainful activity;

2.      if not, whether the claimant has a severe impairment or combination of impairments;

3.      if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.      if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.      if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

14

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.      Standard of Review

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

---

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI.  Discussion

Head raises a single issue for this Court's review: Whether the ALJ failed to tether the RFC to substantial evidence after failing to admit the prior determination's evidence. (ECF Doc. 10, p. 1). She notes that the ALJ determined that her RFC mirrors the opinion of the state agency reviewing physician who adopted the prior ALJ's RFC determination. (*Id.* at p. 8). That prior decision, however, was based on evidence from the prior folder not added to the current record, including consultative examination opinions, and therefore Head was denied the ability to conduct a meaningful review to determine if the RFC was supported by substantial evidence. (*Id.*). Head argues the omission of the evidence from the prior folder amounted to a violation of HALLEX 1-2-1-13 which states that "[a]n ALJ will generally find that evidence in a prior

16

claim(s) file is necessary for a full adjudication of the issues when the ALJ determines" that certain circumstances are present. (*Id.* at p. 9). Head adds that HALLEX 1-2-1-35 requires that "[a]ny information on which the ALJ relies from a prior claim(s) file will be added to the record . . . and will be made available to the claimant and appointed representative, if any, for review." (*Id.* at p. 10).

Head further contends that significant case law requires that ALJ to obtain a medical expert opinion when formulating the RFC unless the "'medical evidence shows relatively little physical impairment' such that the ALJ can permissibly render a commonsense judgment about functional capacity[.]" (*Id.* (citing *Guido v. Comm'r of Soc. Sec.*, No. 13-cv-13520, 2014 WL 4771929, at \*12 (E.D. Mich. Sept 24, 2014 ) (quoting *Deskin v. Comm'r of Soc. Sec.* 605 F.Supp.2d 908, 912 (N.D. Ohio 2008))). Here, Head claims the only opinion the ALJ had to rely upon was that of the state agency reviewing physician who had adopted the prior ALJ's findings without the evidence underlying the prior ALJ's determination being added to the file. (*Id.* at p. 11). Thus, in Head's view, the RFC in the current case appears to be based on the ALJ's own lay opinion, rather than upon substantial evidence, and there is no logical bridge between the evidence and the RFC. (*Id.*).

The Commissioner retorts that Head's argument is, in essence, that the ALJ erroneously applied the principle of res judicata. (ECF Doc. 12, p. 5). The Commissioner, however, contends that the ALJ, noting the principle outlined in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018), determined that he was not bound by the prior ALJ decision due to new and material evidence in the record. (ECF Doc. 12, p. 7). Rather, as required by *Earley*, the ALJ gave a "fresh look to a new application containing new evidence or satisfying a new regulatory threshold that

covers a new period of alleged disability while being mindful of past rulings and record in prior proceedings." (*Id.* (quoting *Earley*, 893 F.3d at 931)).

Further, the Commissioner argues that because Head did not appeal the prior ALJ decision, it became the final decision as to the prior claim, and accordingly that decision was binding on all parties to the hearing, and the period to be adjudicated here began on the date immediately following the date of that decision, November 3, 2020. (*Id.*). Thus, the Commmissioner asserts, the ALJ correctly based his decision on the new evidence in the record that covered the period from February 2021 through May 2021 when assessing an RFC similar to that in the prior decision, and there was no error in omitting the evidence from the prior case from the record here. (*Id.* at pp. 7-8). Finally, the Commissioner notes that the ALJ did not rely solely on the opinion of the state agency reviewing physician in determining Head's RFC, as he also reviewed and found persuasive the opinion of consutative examiner Dr. Khan. (*Id.* at pp. 8-9).

In *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997), the Sixth Circuit said that certain previous cases "clearly demonstrate that the principles of res judicata can be applied against the Commissioner. When the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Id.* at 842. The Social Security Administration adopted this ruling as Acquiescence Ruling 98-4(6). *See* SSR 98-4(6), 63 FR 29771-01, 1998 WL 274052 (June 1, 1998).

But in *Earley v. Commissioner of Social Security*, 893 F.3d 929 (6th Cir. 2018), the Sixth Circuit said that "[w]hen an individual seeks disability benefits for a distinct period of time, each application is entitled to review. There is nothing in the relevant statutes to the contrary. And res

18

judicata only 'foreclose[s] successive litigation of the very same claim.' " *Id.* at 933 ("a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994.").[2] Head's current claim covers the period beginning the day after the issuance of the prior ALJ decision, November 3, 2020 to September 24, 2024. (Tr. 29). This is a distinct period of time from that of Head's previous claim, which covered the period up to November 2, 2020. (Tr. 89). So Head's current application is entitled to a "fresh look.". *See Church v. Comm'r of Soc. Sec.*, 3:25-cv-390, 2025 WL 2410987 at *7 (N.D. Ohio Aug. 20, 2025).

The ALJ for the current application addressed this directly in his opinion, writing:

Upon careful considerate of the medical evidence, I find that new and material evidence and changed circumstances of changes in the regulations have been established after the prior administrative law judge's decision dated November 2, 2020 (Ex. B1A/1). Specifically, there was new and material evidence of record to justify a deviation from the prior ALJ decision. Accordingly, the undersigned is not bound by the principles of res judicata to find that the claimant's severe impairments have limited her to no greater than the limitations that the prior administrative law judge (ALJ) found (See Exhibit B1A).

Furthermore, the undersigned notes the claimant protectively filed a prior Title II application on September 25, 2019, alleging disability beginning September 24, 2019 that was denied initially, denied on reconsideration, and again by ALJ Andreas on November 2, 2020. The claimant did not appeal this decision to the Appeals Council, making the findings of ALJ Andreas the final decision. The undersigned dismisses the request for hearing through November 2, 2020 based on res judicata (20 CFR 404.957(c)(1) and 416.1457(c)(1)) and the undersigned will consider the current claim for the unadjudicated period commencing November 3, 2020.

(Tr. 10-11).

Head argues, without providing support for the claim, that "the ALJ clearly believed that the evidence in the prior determination was enough to inform the RFC," (ECF Doc. 10, p. 10).

---

[2] The Social Security Administration rescinded Acquiescence Ruling 98-4(6) and replaced it with Acquiescence Ruling 24-1(6), effective December 2, 2024, to reflect the Sixth Circuit's *Earley* decision. *See* SSAR 24-1(6), 89 FR 92992, 2024 WL 5256889 (Nov. 25, 2024). SSAR 24-1(6), however, post-dates the ALJ's decision here.

This supposition directly contradicts the current ALJ decision, which cites significant medical evidence for the relevant period from this file as support for his RFC determination. While the Commissioner claims that Head has evinced a misunderstanding of the principle of res judicata (ECF Doc. 12, p. 5), in reality, Head has not advanced a res judicata argument at all. Rather, she suggests that the ALJ has failed to "tether the RFC to substantial evidence after failing to admit the prior determination's evidence" (ECF Doc. 10, p. 1), a claim belied by citations to the record for each piece of evidence cited in the decision used to support the RFC. (*Compare id. with* Tr. 18-22).

Head cites to HALLEX I-2-1-13,[3] which provides guidance as to when to consider evidence in a prior claim file. (*See* ECF Doc. 10, p. 9). Although "the failure to comply with HALLEX, by itself, does not provide grounds for remand by a reviewing court," *Price v. Comm'r of Soc. Sec.*, No. 1:17-cv-404, 2018 WL 4300019, at *18 (S.D. Ohio Sept. 10, 2018), it is instructive for determining whether it was incumbent on the ALJ to consider the evidence that provided the basis for the RFC adopted by the state agency reviewing physician here.

HALLEX I-2-1-13 requires consideration of evidence from a prior claim file when any of the following circumstances arise:

- The pending claim is before the ALJ based on a continuing disability review. See 20 CFR 404.1593 and 416.993.

- The pending claim involves a collateral estoppel issue (HALLEX HA 01220.030). For example, if the claim before the ALJ is title II and there is a prior title XVI allowance addressing an overlapping time period, the ALJ will need to consider the evidence in the title XVI claim file.

- The pending claim involves a possible reopening or res judicata issue (HALLEX HA 01290.000 and HA 01240.040).

---

[3] The HALLEX is a procedural manual utilized by the Commissioner "that sets forth safeguards and procedures for these administrative proceedings." *Robinson v. Barnhart*, 124 F.App'x 405, 410 (6th Cir. 2005). While HALLEX provisions are binding on the Social Security Administration, they are not binding on reviewing courts. *Bowie v. Comm'r of Soc. Sec.,* 539 F.3d 395, 399 (6th Cir. 2008).

- The ALJ must consider findings of an ALJ or the Appeal Council on a prior claim(s) to comply with an Acquiexence Ruling (AR). (See HALLEX 01260.058B for specific examples of AR's that may apply.)

- Fraud or similar fault may be involved in the current or prior claim. (HALLEX HA 01130.000 and HA 01295.000).

Further, it suggests that an ALJ will generally find that evidence in a prior claim(s) is necessary for a full adjudication of the issues when the ALJ determines:

- There is a need to establish a longitudinal medical, educational, or vocational history; or

- The impairment is of a nature that evidence from a prior claim(s) file could make a difference in establishing whether disability is present in the current claim.

Social Security Administration, Hearings, Appeals, and Litigation Law Manual, HALLEX I-2-1-13, found at https://www.ssa.gov/OP_Home/hallex/I-02/I-2-1-13.html  (last visited July 7, 2026).

Head specifically argues that the evidence from her prior adjudication should have been added to the file in the present case not because of the priniciple of res judicata,  but because it was necessary to establish a longitudinal medical, educational, or vocational history, and because the evidence from the file could make a difference in establishing whether disability is present in the current claim. (ECF Doc. 10, p. 9). She bases this argument on the state agency reviewing physician adopting the RFC from the prior ALJ decision, and the ALJ finding that opinion persuasive. (*Id.*). This argument, however, is unpersuasive, because, as the Commissioner notes, Head did not appeal the prior decision, and the prior ALJ's decision if therefore binding on all parties. (Tr. 10-11; 20 CFR § 404.955). Accordingly, the ALJ's review in the present case was properly limited to the period beginning November 3, 2020, the day immediately after the prior decision was entered. (*Id.*). This Court's burden is simply to determine whether substantial evidence in the present decision supports this ALJ's RFC finding. *Rogers,* 486 F.3d at 241. A review of the decision makes clear it does.

21

The ALJ wrote:

The claimant's allegations of disabling functional limitations are not entirely consistent with the evidence of record. The claimant's impairments could reasonably be expected to produce the alleged symptoms, but the intensity of the symptoms and impact on functioning are not consistent with the totality of the evidence. As such, the medical record does not establish functional limitations that would preclude the light exertional level with the additional restrictions stated above. Despite allegations, tests results showed stability and no unexpected findings or evidence of significant worsening until 2024 when it was discovered that many symptoms were caused because she stopped taking her Synthroid for hypothyroidism for two years. The claimant has maintained system functioning as demonstrated during examinations that showed no acute distress, regular heart rate and rhythm, clear lungs, 5/5 strength and full range of motion, intact neurological functioning, and normal coordination, normal gait, no evidence of a prescribed or medically necessary assistive device, cooperative behavior, full orientation, and ability to provide information, answer questions, and follow instructions. Symptoms improved with administration of intravenous Synthroid and resumption of her treatment. Moreover, despite allegations, the claimant's course of treatment provided improvement and stability and generally consisted of follow-up outpatient, routine testing and lab work, a medication regimen, and instruction on diet and exercise.

The undersigned is cognizant that the degree of limitation that a person might experience from impairments might not necessarily be reflected in a particular treatment note; however, in the instant matter, the longitudinal record does not reflect a significant degree of functional limitation from the claimant's impairments. Examination findings also do not support loss of strength, range of motion, sensation, reflexes, coordination, behavior, or cognitive deficits that would support a disabling degree of limitation. The medical evidence, even with a consideration of limitations from pain, does not support a greater degree of limitation than that which is set forth in the above residual functional capacity assessment.

In sum, the claimant's alleged functional limitations are not entirely consistent with the claimant's reported daily functioning, the examination findings of record, and the persuasive portions of the medical opinions. Nonetheless, the above evidence supports that the claimant has experienced the degree of limitation reflected in the residual functional capacity assessment above and discussed above. Thus, light exertion with additional limitations accounts for the claimant's physical impairments and any deficits due to pain, tenderness, reduced range of motion, and antalgic gait. Accordingly, the undersigned finds the record does not establish limitations that would preclude work activity within the residual functional capacity defined in this decision.

(Tr. 17-18).

22

The ALJ then proceeded to thoroughly assess the medical evidence in the file, with the particular emphasis on appointments, records, and examination notes from various providers occurring in the current period, i.e., between February 2021 and April 2024. (Tr. 18-21). The ALJ also properly evaluated the opinion of the state agency reviewing physician, finding it persuasive because it was consistent with the opinion of the consultative examiner who had found that Head:

> [h]ad significant pitting edema of the bilateral lower extremities (Ex.B7F/6). Her memory and concentration were normal (Ex. B7F/6). Her hand eye coordination was good. She appeared to have no balance problems. She had a normal, reciprocal gait pattern without an assistive device. There was numbness of the bilateral fingertips with swelling of the
> bilateral hands, decreased hand grip and dexterity. She had symmetrical bilateral trigger points in all four body quadrants. She was not able lift, carry, and handle light objects (Ex. B7F/7).

(Tr. 22).

The ALJ clearly articulated substantial evidence from the relevant period supporting his RFC determination, and there is a logical and accurate bridge between the evidence and the result. Head's arguments that the prior evidence was necessary to create a longitudinal record or to further bolster her claim for disability find no foundation in the ALJ's analysis. To find otherwise would require this Court to second-guess the ALJ's decisionmaking, and insert itself in matters squarely within the province of the ALJ, which it may not do.

Accordingly, I recommend that the ALJ's decision be affirmed.

## VII. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend the Commissioner's final decision denying Head's applications for DIB and SSI be affirmed.

Dated: July 15, 2026

Reuben J. Sheperd
United States Magistrate Judge

_____

**OBJECTIONS**

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\*\*\*

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019).